

**FILED**

APR 1 4 2014

Clerk, U.S. District Court
District Of Montana
Missoula

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Cause No. CR 09-022-BLG-DWM |
| Plaintiff, | CV 11-127-BLG-DWM |
| vs. | ORDER DENYING § 2255 MOTION AND DENYING CERTIFICATE OF APPEALABILITY |
| GERHARD CURTIS STERN, | |
| Defendant. | |

This case comes before the Court on Defendant/Movant Stern's motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255. Stern filed his § 2255 motion pro se but is now proceeding with counsel Palmer Hoovestal.

A jury found Stern guilty of the aggravated sexual abuse of his daughter, a violation of 18 U.S.C. § 2241(c). "Jane" (a pseudonym) was four years old at the time of the crime and five years old at the time of trial. Stern is currently serving a sentence of 480 months in prison, to be followed by a 20-year term of supervised release. Judgment (Doc. 63) at 2-3. Following an unsuccessful appeal, Stern timely filed a § 2255 motion on November 16, 2011. Mot. § 2255 (Doc. 83) at 14; *Houston v. Lack*, 487 U.S. 266, 270-71 (1988).

1

United States District Judge Richard F. Cebull presided over trial and the initial stages of litigation of the § 2255 motion. He has since retired from the bench. The case was reassigned to the undersigned on April 29, 2013. Order (Doc. 113).

Judge Cebull ruled on most of Stern's claims. *See* Order Denying Some Claims (Doc. 101). Five claims remain outstanding:

(A)   Stern should be permitted to amend his § 2255 motion to add a claim alleging that the United States failed to prove federal criminal jurisdiction because it did not introduce sufficient evidence, under *United States v. Zepeda*, 738 F.3d 201 (9th Cir. 2013), to show that Stern was an Indian person under 18 U.S.C. § 1153.

(B)   Counsel was ineffective because he unreasonably failed to investigate and present to the jury two alternative perpetrators, Marly Killsnight and Stern's "step-brother" or half-brother;

(C)   Counsel was ineffective because he unreasonably failed to move to suppress Stern's statements in his second interview;

(D)   Counsel was ineffective because he unreasonably failed to locate and present to the jury other witnesses to Sonja's alleged "apology"; and

(E)   Stern suffered cumulative prejudice from trial counsel's unreasonable errors.

The parties have conducted discovery and submitted briefs on the motion to add Claim A and on the merits of the claims for relief. *See* Order Setting Briefing Schedule (Doc. 133) at 3 ¶ 3.

# I. Background

On March 7, 2008, Julie LaPlant, a nurse at St. Labre School, was asked to talk with Jane, a four-year-old girl, about head lice. LaPlant asked Jane questions about her washing habits, where she slept, and where she got dressed. In response to a question about dressing, Jane said that her father dressed and undressed in front of her and sometimes helped her to get dressed. Jane then said, "He puts his fingers in my privates, and he put a stick in there, too." Jane also said that she saw her father's "privates" when they played a game, and sometimes she felt pain when or after her father touched her. 1 Trial Tr. (Doc. 70) at 32:23-34:4.[1]

LaPlant took Jane to the counselor's office and called the Bureau of Indian Affairs social services office. LaPlant was instructed to conduct a physical examination. She found no physical indication of abuse, but, LaPlant testified, Jane said during the examination that her "daddy" put his privates in her mouth and it "tastes really gross." *Id.* at 35:2-7, 36:2-4, 39:3-24. Jane was removed from Stern's home.

On April 11, 2008, two FBI agents drove to Stern's residence to talk to him. He came out of his house and sat in their car with them. They told him they wanted to interview him but could not do so at that time because he was intoxicated. Stern

---

[1] The unredacted transcripts are cited here. The redacted transcripts are available in the electronic record as Docs. 77 (Vol. 1) and 78 (Vol. 2).

replied, "Well, let me sit here." Agent Weyand asked him a few questions. Stern denied abusing Jane, denied abusing his sister Sonja twenty years earlier though he was convicted for doing so, and claimed that Sonja had recanted.

Stern was interviewed again on May 8, 2008. He was advised of his rights and signed a form waiving his lawyer's presence. On that occasion, Stern reiterated his denials. He said that Jane had never seen him naked, had never viewed pornography or seen Stern and his wife engage in sexual activity, and did not believe that anyone else had abused Jane. He asserted that Jane's mother, in Tennessee, spoke with her by phone regularly and might have suggested the sexual abuse story to her. He also said "there's a lot of disclosures of sexual abuse at St. Labre." He denied drinking or being drunk around Jane. 1 Trial Tr. at 140:16-143:25.

On February 23, 2009, Stern was indicted on one count of aggravated sexual abuse, a violation of 18 U.S.C. § 2241(c). Jurisdiction was predicated on the Major Crimes Act, 18 U.S.C. § 1153(a). The grand jury charged that, between August 2007 and March 6, 2008, on the Northern Cheyenne Indian Reservation, Stern engaged in a sexual act with a girl under the age of twelve. Indictment (Doc. 1) at 2. Attorney Robert Kelleher was appointed to represent Stern. Order (Doc. 6).

Trial commenced on July 20, 2009. Jane, who was then five years old, testified. She said that "Dad" put a stick in her vagina and put his private in her

4

mouth and it tasted nasty. 1 Trial Tr. at 111:10-18. She occasionally used different anatomical words than she used in talking with LaPlant and an FBI interviewer, but she identified the diagram she had drawn for the interviewer and repeated that her father sexually abused her. *Id.* at 110:13-114:11. Jane also testified that she liked living in Tennessee with her mother, where she had lived before her mother lost custody. She denied having been abused by anyone other than her father. *Id.* at 119:11-15, 121:2-6.

Some of the things Jane said were plainly wrong. For instance, she said that she was in preschool in Tennessee when her father abused her and that she did not go to St. Labre School. *Id.* at 114:20-25. She did go to St. Labre School, and her father was never in Tennessee with her.

Jane's aunt, Stern's younger sister Sonja, also testified at trial, under Fed. R. Evid. 414. She said that Stern raped her and had oral sex with her about twenty years earlier, when she was 8 or 9 years old. She maintained that she had never recanted or apologized. She also said she had never told her father that someone other than Stern had abused her. 1 Trial Tr. at 129:4-133:5.

Stern's wife Pearl, her mother Georgia, and Stern's father testified that Jane seemed to be a happy little girl and had said nothing about sexual abuse to any of them. Pearl and Georgia also testified that they had never seen blood on Jane's clothes, though Jane had told LaPlant that she sometimes bled. 2 Trial Tr. at

5

164:21-25, 174:7-13, 36:19-23. But Stern's father also testified that Jane did not "talk to [him] about what was going on" in her life, *id.* at 160:7-19. Georgia testified that Jane did not talk to her as much as her sister did, though neither girl disclosed any abuse. *Id.* at 174:14-175:4. Two witnesses, Jane's teacher and Georgia, testified that Stern drank around the children, 1 Trial Tr. at 86:10-25, 2 Trial Tr. at 176:14-21, contrary to his statement to Agent Weyand.

Finally, Stern testified. He admitted drinking too much, using prescription anti-depressants, and smoking marijuana while Jane was living with him. 2 Trial Tr. at 189:4-8. He denied abusing Sonja, explaining that he confessed to it at the time because he was "scared" of the police, who interviewed him day after day until he confessed. *Id.* at 183:12-185:24. He also admitted that he "made it up" when he again admitted the offense to treatment providers in order to pass a sex offender treatment class and so obtain earlier release. *Id.* at 192:21-193:15. He denied abusing Jane, *id.* at 187:1-7, and said that he had "no idea why she was saying this," *id.* at 197:3-5.[2]

## II. Claims for Relief and Analysis

### A. Motion to Amend to Add *Zepeda* Claim

Stern moves to amend his § 2255 motion to add a claim that the United States did not introduce sufficient evidence to prove his Indian status. He relies on

---

[2] Stern also initiated a contentious exchange with the prosecutor in which he claimed that she was coaching Jane while she testified. *See* 2 Trial Tr. at 193:16-195:25.

*United States v. Zepeda*, 738 F.3d 201, 204 (9th Cir. 2013). On February 10, 2014,the panel opinion in *Zepeda* was withdrawn pending rehearing en banc. *United States v. Zepeda*, 742 F.3d 910, 910 (9th Cir. 2014) (Kozinski, Ch. J.). Oral argument is currently set for June 16, 2014. Order at 1, *Zepeda*, No. 10-10131 (9th Cir. Feb. 11, 2014). The panel opinion is no longer binding precedent. Because the opinion may be reinstated, it is more efficient to proceed on the assumption that *Zepeda* might provide Stern a basis for relief. The question is not whether *Zepeda* is good law but, assuming it is, whether Stern may amend his § 2255 motion to add the claim.

Fed. R. Civ. P. 15 "applies to habeas petitions with the same force that it applies to garden-variety civil cases." *James v. Pliler*, 296 F.3d 1124, 1126 (9th Cir. 2001) (internal quotation omitted) (quoting *Calderon v. United States Dist. Ct.*, 134 F.3d 981, 986 n. 6 (9th Cir. 1998)). Rule 15(a) provides that "leave [to amend] shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Courts "determine[] the propriety of a motion to amend by ascertaining the presence of any of four factors: bad faith, undue delay, prejudice to the opposing party, and/or futility." *Griggs v. Pace Am. Group, Inc.*, 170 F.3d 877, 880 (9th Cir. 1999). Inferences are to be drawn in favor of amendment. *Id.*

The United States asserts that the *Zepeda* claim is both time-barred and procedurally barred. United States Br. (Doc. 138) at 9-16. In effect, these are

7

arguments that amendment would be futile. Stern responds that the *Zepeda* claim should relate back to the original motion and the default resulting from his failure to raise the claim on direct review is excused. Reply Br. (Doc. 140) at 1-6.

### 1. Nature of the *Zepeda* Claim

As an initial matter, it is helpful to clarify what a *Zepeda* claim is not.

To prove a defendant is an Indian person, the United States must show (1) that the defendant has a sufficient degree of Indian blood derived from a federally recognized tribe, and (2) that the defendant is recognized by a federally recognized tribe or by the federal government as an Indian person. *Zepeda*, 738 F.3d at 210 (following *United States v. Maggi*, 598 F.3d 1073, 1080 (9th Cir. 2010), and *United States v. Bruce*, 394 F.3d 1215, 1223 (9th Cir. 2005)). The panel opinion in *Zepeda* held that a tribal enrollment certificate does not suffice to prove the defendant's blood is derived from a federally recognized tribe if it is not precise enough to identify only a federally recognized subset of a larger tribe that is not federally recognized *in toto*. *See id.* at 210-213. Indian status is important because, among other possibilities not relevant here, the federal government does not have jurisdiction over crimes committed by non-Indians against non-Indians in Indian country; has jurisdiction over crimes committed by non-Indians against Indians and by Indians against non-Indians in Indian country; and has jurisdiction over only some crimes committed by Indians against Indians or non-Indians in Indian

8

country. *See generally Bruce*, 394 F.3d at 1221.

28 U.S.C. § 2255(a) identifies various grounds for relief against a federal criminal judgment. One of these grounds is that "the court was without jurisdiction to impose such sentence" or conviction. The Court assumes, for the sake of argument, that if Stern showed he was *not* an Indian person, he would show the court was without jurisdiction to impose the sentence under 18 U.S.C. § 1153.[3] But that is not his claim. His claim is that the United States *failed to prove* he was an Indian person subject to prosecution under the Major Crimes Act, 18 U.S.C. § 1153. That is a claim challenging the sufficiency of the evidence, *see Jackson v. Virginia*, 443 U.S. 307, 324 (1979), not truly a "jurisdictional" claim, *cf. United States v. Ratigan*, 351 F.3d 957, 961-64 (9th Cir. 2003). When the United States fails to introduce evidence sufficient to prove beyond a reasonable doubt that a defendant distributed methamphetamine, that does not mean the defendant did not distribute methamphetamine. Likewise, if the United States did not introduce sufficient evidence to prove Stern was an Indian person, that does not mean Stern was not an Indian person.

A claim that the court was without jurisdiction even to *try* the defendant

---

[3]  At least under 18 U.S.C. § 1153(a), the Court would lack jurisdiction. It would likely have jurisdiction under 18 U.S.C. § 1152. For present purposes, however, there is no need to consider what role the existence of jurisdiction under another code section would play in a claim under 28 U.S.C. § 2255. *See generally United States v. Bruce*, 394 F.3d 1215, 1218-22, 1227-31 (9th Cir. 2005).

likely could be raised at any time, as Stern argues, although the Court makes no decision on that point. But Stern's *Zepeda* claim is not of that nature. It is a claim that the sentence is "otherwise subject to collateral attack," 28 U.S.C. § 2255(a). Consequently, time and procedural bars apply, *see Ratigan*, 351 F.3d at 962-63, as they would apply to any other collateral challenge to a conviction or sentence.

## 2. Time Bar

The parties agree the *Zepeda* claim was asserted after the federal limitations period expired on December 3, 2011. 28 U.S.C. § 2255(f); *Gonzalez v. Thaler*, __ U.S. __, 132 S. Ct. 641, 653-54 (2012). Thus, to avoid a time bar, Stern must show that the claim relates back to a timely claim, that the limitations period is equitably tolled for some reason, or that he is excused from complying with the limitations period because he is actually innocent.

Based on Fed. R. Civ. P. 15(c), Stern asserted in his motion to amend that the *Zepeda* claim "relates back, *nunc pro tunc*," to the original motion and "is identified as 'Ground Four.'" Reply Br. at 2-3. The Court has been unable to locate any "Ground Four" in Stern's voluminous pleadings that makes any suggestion whatever about jurisdiction, much less that alleges anything about Stern's Indian status. *See* Mot. § 2255 (Doc. 83); Supp. (Doc. 89-1); Addendum (Doc. 91); Br. in Supp. (Doc. 93). Although Stern did challenge federal jurisdiction (in "Ground Eight"), he referred only to putative rights to be tried by his Tribe and to have an

extradition hearing – hardly the stuff of a claim alleging insufficient proof of Indian status. Addendum (Doc. 91) at 35-36; *see also* Br. in Supp. (Doc. 93) at 67-72; *id.* at 86-94 (detailing multiple objections to counsel's Rule 29 motion, but not alleging anything about Indian status). In addition, "Ground Eight" was itself untimely.

The Court can only conclude that the *Zepeda* claim is not "tied to a common core of operative facts" with any other claim timely raised. *Mayle v. Felix*, 545 U.S. 644, 664 (2005). It does not relate back under Rule 15(c).

Stern offers no basis for equitable tolling of the limitations period. *E.g.*, *Holland v. Florida*, 560 U.S. 631, 649 (2010). His argument for "actual innocence" is addressed below, as it is relevant to both time bar and procedural bar.

### 3. Procedural Bar

Like all other claims except claims of ineffective assistance of counsel, Stern's *Zepeda* claim is subject to the general rule: a claim that *can* be raised on direct review *must* be raised on direct review, or it is procedurally defaulted. *Massaro v. United States*, 538 U.S. 500, 504 (2003). Because Stern did not raise the *Zepeda* claim on direct review, it may be heard only if he can excuse his procedural default either by showing cause and prejudice or by proving he is actually innocent of the offense of which he was convicted. *Bousley v. United States*, 523 U.S. 614, 622 (1998); *see also* United States Br. (Doc. 138) at 14-16.

11

Ineffective assistance of counsel, whether at trial or on appeal, may serve as cause to excuse procedural default. *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991). Stern does not, in so many words, assert cause and prejudice to excuse his default. He did not present the *Zepeda* claim as a claim of ineffective assistance of counsel, though he suggests he did, *see* Reply Br. at 6, but only as a freestanding claim. Assuming, however, he relies on ineffective assistance as cause to excuse his procedural default, he cannot show that counsel was ineffective for failing to make the *Zepeda* argument.

Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Stern must show (1) that counsel's performance fell below an objective standard of reasonableness, *id.* at 687-88, and (2) that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. "[T]here is no reason . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

As in *Bousley*, 523 U.S. at 622-23, the *Zepeda* argument was certainly there to be made; after all, Zepeda's counsel thought of it. But the facts of Stern's case are significantly different from Zepeda's. Zepeda's tribal enrollment certificate showed he was ¼ Pima and ¼ Tohono O'odham. He was an enrolled member of "the Gila River Indian Community of the Gila River Indian Reservation, Arizona."

*Zepeda*, 738 F.3d at 204. He was *not* an enrolled member of the Tohono O'odham

Nation of Arizona or of the Pima tribe or band. The United States offered no

evidence showing that the Tohono O'odham Nation of Arizona or the Pima tribe or

band were "entities recognized and eligible to receive services from the Bureau of

Indian Affairs." 77 Fed. Reg. 47868, 47868 (Aug. 10, 2012) (title); *see also*

*Zepeda*, 738 F.3d at 212. The Pima tribe or band was not, in fact, federally

recognized. The Gila River Indian Community and the Tohono O'odham Nation of

Arizona were federally recognized, but Zepeda's bloodline was descended only

from the latter. It was described solely as "the Tohono O'odham Nation," not "the

Tohono O'odham Nation *of Arizona*," as specified in the Federal Register, and, at

any rate, Zepeda was not an enrolled member of the Tohono O'odham Nation of

Arizona. *Id.* at 212-13.

Stern's tribal enrollment certificate said that he "is of ¼ degree Northern

Cheyenne blood and ¼ total degree of Indian blood, as shown on the Northern

Cheyenne Tribal Rolls." Stern Br. (Doc. 135) at 11-12; 1 Trial Tr. (Doc. 70) at

136:5-16. At the time of the crime, the Bureau of Indian Affairs recognized and

provided services to "the Northern Cheyenne Indian Tribe of the Northern

Cheyenne Indian Reservation, Montana." 72 Fed. Reg. 13648, 13649 (Mar. 22,

2007). Stern was living on the Northern Cheyenne Reservation in Montana. That is

where the crime occurred. 1 Trial Tr. at 135:18-25. When Stern's daughter made

13

the statement that led to Stern's prosecution, the nurse at St. Labre School[4] contacted "BIA social services." *Id.* at 34:9-15. Jane was examined by a doctor employed by the Indian Health Service. *Id.* at 40:20-23, 43:8-12. Both a reasonable juror and a reasonable lawyer could conclude that all these facts supported a finding, beyond reasonable doubt, that Stern was an Indian person.

Against this evidence, counsel suggests "[a]rguably, the BIA's specific language 'Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, Montana,' does not include the 'Northern Cheyenne' and 'Northern Cheyenne Tribe' that Stern's Certification of Northern Cheyenne Tribal Enrollment describes." Stern Br. at 13. This is not argument but speculation. Stern hypothesizes that there may be other, distinct groups of persons who have blood which the Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation of Montana would describe as "Northern Cheyenne," even though that blood is not the same as the "Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation."[5] The two other, distinct groups he mentions – the Cheyenne and Arapaho Tribes of Oklahoma and the Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota – are both federally recognized and so

---

[4] A reasonable Montana juror in the Billings Division might well know that St. Labre is a Catholic school for Indian children from the Crow and Northern Cheyenne Reservations.

[5] Zepeda did not need to speculate. Absent additional evidence, the Gila River Indian Community does not appear to be the same entity as the Tohono O'odham Nation of Arizona, and Zepeda was not an enrolled member of the latter.

would have shown Stern's Indian blood derived from a federally recognized tribe.

A reasonable lawyer would have perceived little percentage in challenging Stern's status as an Indian person, and there is no reasonable probability that either the trial court or the appellate court would find the evidence of Stern's Indian status was insufficient to support a conviction.

Stern does not show cause to excuse his procedural default. "Actual innocence" is discussed below.

### 4. "Actual Innocence"

Where it exists, "actual innocence" excuses both procedural default and failure to comply with the federal limitations period. *Bousley*, 523 U.S. at 623-24; *McQuiggin v. Perkins*, __ U.S. __, 133 S. Ct. 1924, 1928 (2013). As used here, "actual innocence" means "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). "[I]n this regard . . . 'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623. All evidence must be considered, "including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." *Id.* at 328 (internal quotation marks omitted).

Stern points to no evidence capable of showing that, more likely than not, no

15

reasonable juror could have found Jane was sexually abused, or Stern was not the culprit, or Stern was not an Indian person. In particular, throughout his submissions in connection with the *Zepeda* claim, he has never claimed that he is not, in fact, an Indian person, as that term is defined in federal criminal law. Because Stern fails to prove his factual innocence, neither the procedural bar nor the time bar is excused.

### 5. Conclusion

Stern's motion to amend his § 2255 motion is denied as futile. The *Zepeda* claim is both time-barred and procedurally barred. Stern has neither excused his failure to comply with procedural requirements nor shown that such bars do not apply in his case.

### B. *Strickland* Claim re: Alternative Perpetrators

Stern alleges that trial counsel was ineffective because he failed to pursue information available to him suggesting that two other individuals, Marley Killsnight and a juvenile male, may have been responsible for sexually assaulting Jane. Both Killsnight and the juvenile male were convicted of sexually abusing young girls. Documentation of Killsnight's conviction has never been presented. But shortly before Stern's trial, the juvenile male was convicted in this Court of sexually abusing Jane's sister. *See* Stern Presentence Report ¶ 51; *see also* Offer of Proof (Doc. 17) at 3, *United States v. Juvenile Male*, No. CR 09-34-BLG-RFC (D.

Mont. Apr. 16, 2009) (under seal).[6] Further proceedings were warranted.

### 1. Expert Testimony re: False Memory and Suggestibility

An important theme in Stern's brief on the merits of this claim is his contention that trial counsel should have called an expert witness to educate the jury about children's susceptibility to suggestion and false memory. He also suggests that counsel should have introduced the transcript (or perhaps the video recording) of Jane's forensic interview with Agent Stephanie Knapp for the purpose of challenging Jane's credibility. *See especially* Forensic Interview Tr. (Doc. 137-1) at 9:24-11:16 (showing that Jane did not appear to understand the difference between guessing and not knowing).

But Stern did not claim in his § 2255 motion that trial counsel was ineffective for failing to call an expert on those matters. He also did not claim the interview should have been shown to or transcribed for the jury. He did not move, timely or otherwise, to amend his motion to add these claims. The United States had no notice of these claims, and Kelleher had no opportunity to respond to them in his deposition.

Stern did assert in his *pro se* pleadings that Kelleher should have retained an expert to testify to "not the veracity of [Jane's] testimony and disclosures, but the

---

[6] A court may take judicial notice of its own records. *Rand v. Rowland*, 154 F.3d 952, 961 (9th Cir. 1998) (en banc); *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980). The "J." referred to in the juvenile's case is not Jane, Stern's victim.

methods and practices employed by the various individuals which interviewed her." Br. in Supp. (Doc. 93) at 100. Judge Cebull denied this claim because Kelleher *did* retain an expert for that purpose:

> Stern claims that Kelleher was ineffective because he failed to present testimony from an expert who could explain how a child's memory can be affected by repeated interviews and by interviewing techniques. In fact, Kelleher obtained an expert to provide such testimony. Ex Parte Mot. (Doc. 14) at 1-3; Veraldi Aff. (Doc. 33) at 1-4. Because he did so, the prosecution decided not to call witnesses who would have testified about Jane's sexualized behaviors. 1 Trial Tr. at 16:8-12. But Dr. Veraldi's examination of interviewing techniques would not explain Jane's initial disclosure, which was wholly unsolicited and spontaneous. This claim, Add. at 48-50, is denied.

Order Denying Some Claims (Doc. 101) at 23-24; *see also* Kelleher Dep. (Doc. 139-30) at 37:3-22.

Moreover, because he did not timely assert the claim, Stern himself has not located an expert witness available to Kelleher who would have endorsed Stern's theory that Jane could have made a mistake about the identity of the perpetrator even if she did not make a mistake about having been sexually abused. Thus, even assuming, solely for the sake of argument, that Kelleher should have thought to consult with such an expert (and noting that Stern did not ask Kelleher whether he thought about it or not), Stern has not carried his burden of showing he was prejudiced by the fact that Kelleher did not introduce expert testimony on children's susceptibility to suggestion and false memory.

For these reasons, the Court will not consider Stern's argument that counsel should have consulted an expert on children's susceptibility to suggestion and false memory or should have introduced all or part of the forensic interview into evidence.

### 2. Alternative Perpetrators

Stern claims that Kelleher should have investigated the possibility that two other persons, Marly Killsnight and a juvenile relation of Stern's (here called simply "the juvenile"), could have sexually abused Jane.

Stern told Kelleher about both Killsnight and the juvenile. Kelleher testified that he did not follow up on the prospect of imputing the crime to them rather than Stern for three reasons. First, Jane unequivocally identified Stern – describing him both as her father and by name as "Jerry Stern" – and never suggested anyone else was involved or responsible. Jane's statements indicated the abuse occurred in broad daylight, in the course of normal routines such as getting dressed. Kelleher believed it was unlikely that a reasonable juror would believe that Jane was wrong about the identity of the perpetrator. Kelleher Dep. (Doc. 139-30) at 14:11-15:3. Second, Kelleher believed that "even if we could convince a jury that one of these other fellows molested his daughter, logically it did not rule out the possibility that he, too, had molested his daughter." *Id.* at 17:12-16. Third, Stern had told FBI agents that he did "not think anyone who comes to his home ever touched his girls

in a sexual manner," *id.* at 18:1-3, so that turning to a theory of alternative perpetrators at trial would undermine Stern's credibility.

Reasonable lawyers could view Kelleher's second and third reasons differently than Kelleher did,[7] although that does not necessarily make Kelleher's view unreasonable. The first reason Kelleher gave, however, is decisive. Jane's statements about the nature of the abuse were somewhat inconsistent. The strongest aspect of her statements was her identification of Stern. Kelleher used Jane's inconsistencies in describing the abuse to cast doubt on the apparent certainty with which she named Stern. That approach amounted to a negation defense, i.e., the abuse did not occur. To suggest someone else abused Jane would have undermined the only helpful inferences that could be drawn on Stern's behalf from Jane's statements. Given Jane's statements alone, the alternative-perpetrator defense was the *worst* fit with the available facts.

Stern points out, rightly, that Kelleher "elected to put Stern on the witness stand, have him deny [the charge], and hopefully the jury would believe him." Reply Br. at 7. If Stern could show that Kelleher would have discovered additional

---

[7] A lawyer familiar with the number of sexual abuse cases on the Reservation may form the impression that sexual abuse is rampant, but a juror might not credit the possibility of numerous perpetrators of sexual abuse, including Stern. If alternative perpetrators could reasonably be suggested in this case, that fact would likely contribute to reasonable doubt. As for Stern's credibility, it was undermined in other ways, *see, e.g.*, 1 Trial Tr. at 86:10-25, 143:5-7, and, on the other hand, a reasonable juror might understand that Stern was not motivated to blame Killsnight or the juvenile when speaking with the FBI if he did not believe his four-year-old daughter's statements really meant that she was sexually abused, *id.* at 140:16-143:25.

20

admissible and exculpatory evidence by following up on Killsnight or the juvenile – evidence that directly incriminated them or exonerated Stern – then he might persuasively argue it was unreasonable for Kelleher to assume that investigating them would be a "dead end" and "a waste of resources." Kelleher Dep. at 39:25-40:10. But Stern has not done that. Consequently, he fails to prove that Kelleher's decision not to pursue the alternative-perpetrator defense was unreasonable. He also fails to show a reasonable probability that he would have been acquitted if Kelleher had followed up on the alternative perpetrator approach.

### 3. Conclusion

Stern has shown there may have been other ways of defending the case. He has not shown that Kelleher's way of defending the case was objectively unreasonable or that he was prejudiced by the fact that Kelleher did not pursue alternative defenses. This claim must be denied.

### C. Remaining Claims

Stern notes in his brief that he "will not address the suppression issue or the issue relating to Sonja Stern." Stern Br. (Doc. 135) at 2 n.1. Those claims, Claims C and D, do not have sufficient factual support in the record. They are denied for lack of merit.

Because all of Stern's claims lack merit, there is no need to consider his claim of cumulative error. Claim E is denied.

21

### III. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2255 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Where a claim is dismissed on procedural grounds, the court must also decide whether "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Gonzalez*, 132 S. Ct. at 648 (quoting *Slack*, 529 U.S. at 484).

Reasonable jurists would not disagree with Judge Cebull's denial of several claims before requiring a response from the United States. Counsel had no realistic prospect of excluding Jane's spontaneous disclosure of sexual abuse by her father in response to a nurse's questions about head lice and dressing and bathing practices in the home. Counsel ably litigated the issue of the Fed. R. Evid. 414 evidence; the fact that he lost does not mean he was ineffective. Stern identified no basis for a motion to suppress his admissions to FBI agents in his first interview,

and, although he testified at trial, he did not tell the jury that he did not say what the agent testified he said. Stern's objections to various witnesses' testimony either focus on unremarkable remarks or misunderstand the relevance of the testimony. His proffered questions either ignore the risk of an adverse response or pursue non-probative matters. His remaining claims of ineffective assistance are either contradicted by the record or are irrelevant. *See* Order Denying Some Claims (Doc. 101) at 13-24.

Moreover, there was no prosecutorial misconduct in chambers, no witnesses were clandestinely "coached" in the courtroom, and there was no identifiable error in the manner in which the jury was drawn. *Id.* at 24-25.

As for the claims Stern had an opportunity to develop, he abandoned his claims that trial counsel should have pursued evidence of his sister's "apology" and his claim that his second statement should have been suppressed. As a result, those claims lack factual support. Had there been other evidence to discover by following up on alternative perpetrators, it might have been unreasonable for counsel to rely solely on Jane's statements to develop his defense. But Stern has not shown that anything more could have been discovered, and the strongest part of Jane's statement was her identification of Stern as the perpetrator. Thus, the evidence shows that counsel pursued the only realistic defense available.

Finally, regarding Stern's motion to amend his original § 2255 motion to

add a claim under *United States v. Zepeda*, 738 F.3d 201 (9th Cir. 2013),

*withdrawn pending reh'g en banc*, 742 F.3d 910 (9th Cir. 2014) (Kozinski, Ch. J.),

reasonable jurists would see no alternative to imposition of both a time bar and a

procedural bar. Stern mentioned nothing at all about his Indian status until well

after the close of the federal limitations period. He does not show counsel was

ineffective for failing to make a *Zepeda* argument at trial or on appeal. He does not

even now claim that he actually is not an Indian person within the legal meaning of

the term, and he does not prove he is otherwise actually innocent. Amendment

would be futile.

Reasonable jurists would find no basis for encouraging further proceedings

on any claim. A COA is denied.

Accordingly, IT IS HEREBY ORDERED as follows:

1. Stern's motion for leave to amend the § 2255 motion to add a *Zepeda*

claim (Doc. 123) is DENIED as futile;

2. Claims B through E are DENIED for lack of merit;

3. All other claims having been denied, *see* Order (Doc. 101) 26-27 ¶ 2,

Stern's motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255

(Doc. 83) is DENIED;

4. A certificate of appealability is DENIED. The Clerk of Court shall

immediately process the appeal if Stern files a Notice of Appeal; and

5. The Clerk of Court shall ensure that all pending motions in this case and in CV 11-127-BLG-DWM are terminated and shall close the civil file by entering judgment in favor of the United States and against Stern.

DATED this ___ day of April, 2014.

Donald W. Molloy
United States District Court